IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**SIERRA CLUB,**

      Plaintiff,

v.

**SAN JUAN COAL COMPANY, BHP
BILLITON, LTD., PUBLIC SERVICE
COMPANY OF NEW MEXICO,** and **PNM
RESOURCES, INC.,**

      Defendants.

Case No. 10-cv-00332-MCA-LAM

**CONSENT DECREE**

## TABLE OF CONTENTS

I.      Background ........................................................................................................... 3

II.     Jurisdiction and Venue ....................................................................................... 4

III.    Applicability ........................................................................................................ 5

IV.    Definitions ........................................................................................................... 5

V.      Performance Obligations ................................................................................... 11

       A. The Recovery System ................................................................................... 11

           1.   Site Acquisition and Governmental Approvals for Site Characterization ........... 11

           2.   Site Characterization and Formulation of Site-Specific Design Criteria .............. 13

           3.   The Recovery System Operations and Closure Plan ........................................... 14

           4.   Construction and Operation of the Recovery System ......................................... 25

           5.   Removal of the Recovery System from Service .................................................. 27

           6.   Additional Monitoring Provisions ...................................................................... 28

       B.   Investigation and Evaluation of Alternative Remedial Measures ................................ 30

VI.    Permits ............................................................................................................... 31

VII.   Supplemental Environmental Projects ............................................................ 35

VIII.   Environmental Restoration Projects ............................................................... 35

IX.    Access, Recordkeeping, and Reporting ........................................................... 37

       A.   Sierra Club's Site Access .............................................................................. 37

       B.   Exchange of Information ............................................................................... 43

X.      Recovery for Consent Decree Costs ................................................................ 44

XI.    Resolution of Claims ......................................................................................... 44

XII.   Attorneys' Fees and Costs ................................................................................ 46

XIII.   Confidentiality Provisions ................................................................................ 47

XIV.   Modification and Transferability ..................................................................... 48

XV.    Retention of Jurisdiction .................................................................................. 49

XVI.   Dispute Resolution ........................................................................................... 49

XVII.   Termination of Consent Decree ....................................................................... 52

XVIII.   Notices ............................................................................................................... 53

XIX.   Force Majeure ................................................................................................... 54

XX.    General Provisions ............................................................................................ 57

XXI.   Integration ......................................................................................................... 59

XXII.   Signatories and Service .................................................................................... 59

XXIII.   Dismissal of BHP Billiton, Ltd. and PNM Resources, Inc. ............................ 60

XXIV.   Effective Date ................................................................................................... 60

XXV.   Final Judgment .................................................................................................. 60

Exhibits (5)

Upon consideration of the Motion for Entry of Consent Decree filed by the Parties, it is hereby ORDERED, ADJUDGED, AND DECREED as follows:

## I.      BACKGROUND

1.      Sierra Club has filed a lawsuit in the United States District Court for the District of New Mexico ("Court") as Cause No. 10-cv-00332-MCA-LAM ("Lawsuit") against San Juan Coal Company ("SJCC"), BHP Billiton, Ltd., Public Service Company of New Mexico ("PNM"), and PNM Resources, Inc. (altogether, "Defendants").

2.      Sierra Club claims Defendants have violated and continue to violate the requirements of the Surface Mining Control and Reclamation Act, 30 U.S.C. §§ 1201–1328 ("SMCRA"), the approved New Mexico state regulatory program promulgated thereunder, 30 C.F.R. Part 931 ("the New Mexico Program"), and the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901–6992k, ("RCRA") at the San Juan Generating Station and the San Juan Mine (together, the "Facilities").

3.      Sierra Club seeks injunctive relief and civil penalties.

4.      Sierra Club alleges that activities and operations at the Facilities have caused releases of water which have resulted in, and will continue to result in, concentrations of arsenic, barium, boron, cadmium, chloride, chromium, fluoride, lead, nitrates, selenium, sodium, sulfates, total dissolved solids, and uranium in surface water and alluvial and other groundwater to exceed applicable state and federal standards.

5.      PNM and SJCC (collectively, the "Companies") and Sierra Club (the Companies and Sierra Club are sometimes collectively referred to herein as the "Parties") agreed on August 27, 2010, to stay ongoing proceedings in the Lawsuit pending discussions aimed at

3

resolving Sierra Club's claims through a mutually-agreeable settlement, and on August 27, 2010, this Court entered an Order granting the Parties' Joint Motion to Stay the Litigation.

6.      The Parties engaged in lengthy settlement negotiations including the development and informal exchange of Settlement Information to facilitate their settlement negotiations and to better define the technical matters at issue in the Lawsuit.

7.      Defendants deny and dispute that any violations or non-compliance as alleged by Sierra Club have occurred or are occurring, maintain that they have been and remain in compliance with SMCRA, RCRA, the CWA, and all applicable federal, state, and local environmental laws and regulations, and are not liable for civil penalties or injunctive relief.

8.      The Parties have agreed, and this Court by entering this Consent Decree finds, that: this Consent Decree has been negotiated in good faith and at arm's length; this settlement is fair, reasonable, and consistent with the goals of SMCRA, RCRA, and the CWA, in the best interest of the Parties, and in the public interest; and that entry of this Consent Decree without further litigation is the most appropriate means of resolving this matter.

## II.     JURISDICTION AND VENUE

9.      This Court has jurisdiction over the Companies and the subject matter of this Consent Decree pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 30 U.S.C. § 1270 (SMCRA citizen suit provision), and 42 U.S.C. § 6972 (RCRA citizen suit provision).

10.     Venue is proper with respect to the Companies in the District of New Mexico: (a) pursuant to 28 U.S.C. § 1391(b)–(c) because it is the judicial district in which the corporations SJCC and PNM reside and also because it is the judicial district in which a

4

substantial part of the alleged events or omissions giving rise to the claim occurred; (b) pursuant to 30 U.S.C. § 1270(c) because it is the judicial district in which the surface coal mining operation complained of is located; and (c) pursuant to 42 U.S.C. § 6972 because it is the judicial district in which the alleged violation occurred.

11.     Neither BHP Billiton, Ltd. nor PNM Resources, Inc. has been served in this Lawsuit.

12.     For purposes of this Consent Decree or any action to enforce this Consent Decree, the Parties consent to this Court's jurisdiction over this Consent Decree and consent to venue in this judicial district.

**III.     APPLICABILITY**

13.     The provisions of this Consent Decree apply to and are binding upon Sierra Club and those with authority to act on its behalf, including, but not limited to, its officers, directors, and staff, but only in their capacities as such.

14.     Subject to the provisions of Section XIV, the provisions of this Consent Decree apply to and are binding upon the Companies, any of their respective successors and/or assigns, and those with authority to act on their behalf, including, but not limited to, their officers, directors, staff, but only in their capacities as such.

15.     The provisions of this Consent Decree apply to and are binding upon the Parties and their contractors and agents for the purposes of Section XIII.

**IV.     DEFINITIONS**

16.     Whenever the terms set forth below are used in this Consent Decree, the definitions in this Paragraph shall apply.

(a)     "Alternative Remedial Measure(s)" shall mean the measure or measures to which the Parties may agree under the provisions of Section V.B.

(b)     "Administrative Permit Amendment" shall mean any permit application that requests an amendment or modification to an existing permit, which is limited to the following: (i) a change of the name, address, or telephone number of the permittee; (ii) the transfer or assignment of the permit; (iii) the correction of a typographical error in the permit; or (iv) the replacement of any permitted equipment with equipment of substantially like kind.

(c)     "Clean Air Act" shall mean the Clean Air Act, 42 U.S.C. §§ 7401–7671q, and regulations promulgated thereunder.

(d)     "Clean Water Act" or "CWA" shall mean the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1387, and regulations promulgated thereunder.

(e)     "Companies" shall mean SJCC and PNM.

(f)     "Court" shall mean the United States District Court for the District of New Mexico.

(g)     "Consent Decree" shall mean this Consent Decree.

(h)     "Design Criteria" shall mean those site-specific design criteria set forth in Paragraphs 22 through 25.

(i)     "Environmental Restoration Projects" shall mean those projects set forth in Section VIII.

6

(j)     "Facilities" shall mean PNM's San Juan Generating Station and SJCC's San Juan Mine, both located in San Juan County, New Mexico near Waterflow, New Mexico.

(k)     "Financial Assurance Plan" shall mean that document prepared in accordance with the requirements of Paragraph 28.

(l)     "Laws" shall mean all foreign, federal, tribal, state, and local statutes, laws, ordinances, regulations, rules, resolutions, orders, determinations, writs, injunctions, common law rulings, awards (including, without limitation, awards of any arbitrator), judgments, and decrees applicable to the Companies and to the Facilities (including, without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601–9675, SMCRA, RCRA, and the CWA), relating to the remediation, generation, production, installation, use, storage, treatment, transportation, release, threatened release, or disposal of hazardous materials or hazardous or other wastes, or noise control, or the protection of human health, safety, natural resources, animal health or welfare, or the environment. This definition only applies to the reference to "Laws" in Paragraph 78 herein.

(m)     "New Mexico Program" shall mean the approved state regulatory program for New Mexico pursuant to SMCRA, 30 C.F.R. Part 931.

(n)     "Operations and Closure Plan" shall mean that document prepared in accordance with the requirements of Paragraph 27.

(o)     "Parties" shall mean SJCC, PNM, and Sierra Club.

7

(p) "Permit Application" shall mean any regulatory permit application required for the construction, operation, maintenance, or removal from service of the Recovery System, but shall not include any permit applications that are required for Site Characterization.

(q) "PNM" shall mean Public Service Company of New Mexico.

(r) "Raw Water Reservoir Recovery Trench" shall mean the recovery trench and associated equipment to be constructed and installed pursuant to Section VIII in the vicinity of the San Juan Generating Station raw water reservoir.

(s) "RCRA" shall mean the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901–6992k, and regulations promulgated thereunder.

(t) "Recovery System" shall mean the slurry wall and the associated recovery trench as described in Paragraphs 22 and 23 to be constructed at the location generally described on Exhibit 1.

(u) "Recovery System Cost" shall mean all costs of acquiring property, equipment, access rights, water rights, and all other goods and services for Site Characterization, permitting (including financial assurance costs paid to third parties, if any), design, construction, and closure of the Recovery System and Recovery System Site. To the extent that any equipment used for the foregoing purposes is also utilized for tasks that are unrelated to the Recovery System Site, then the cost of such equipment shall be pro-rated in a manner that reflects the proportionate utilization of the equipment for the Recovery System Site.

8

(v)     "Recovery System Site" shall mean all land areas: (i) upon which the construction, operation, maintenance, repair, storage, or closure of the Recovery System are ongoing; (ii) where the natural land surface is or remains disturbed as a result of the foregoing activities; (iii) where non-public roads are used to gain access for purposes of the foregoing activities; and (iv) where any structures, facilities, or other materials are located as a result of the foregoing activities. Notwithstanding the foregoing, the Recovery System Site shall not include any part of the currently fenced area of the San Juan Generating Station property, any electrical lines used to supply electricity to the Recovery System, Well RCB-1, Well WWA-4BC, the surface water monitoring station upstream of the San Juan Generating Station in the Westwater Arroyo, or any existing lines or facilities used to transport water to any evaporation pond at the San Juan Generating Station. No part of the existing SJCC lease or mine permit area shall be included in the Recovery System Site as long as the area is subject to U.S. Bureau of Land Management or New Mexico Energy Mineral and Natural Resources Department Mining and Minerals Division environmental requirements, respectively.

(w)     "San Juan Participants" shall mean the co-owners of the various units at the San Juan Generating Station as of the date of entry of this Consent Decree, in particular, PNM, Tucson Electric Power Company, Southern California Public Power Authority, Tri-State Generation and Transmission Association, Inc., M-S-R Public Power Agency, City of Anaheim, California, City of Farmington, New Mexico, the Incorporated County of Los Alamos, New Mexico, and Utah Associated Municipal Power Systems and any of their respective successors and assigns.

9

(x)     "Settlement Information" shall mean all confidential information and data exchanged by the Parties in furtherance of the settlement negotiations pursuant to the letter agreements between the Parties dated May 21 and 27, 2010.

(y)     "Site Characterization" shall mean all work associated with the assessment of the final location, configuration, and design of the Recovery System as required under Section V.A.2, including, but not limited to, surface and subsurface investigation and testing, related modeling, and preparation of the final Site Characterization report.

(z)     "SJCC" shall mean San Juan Coal Company.

(aa)    "Slurry Wall Construction Standards" shall mean those minimum construction standards set forth in Paragraph 22.

(bb)    "SMCRA" shall mean the Surface Mining Control and Reclamation Act, 30 U.S.C. §§ 1201–1328.

(cc)    "Study Area" shall mean the area of the Shumway and Westwater Arroyos extending from the Recovery System to the location noted on Exhibit 2 in which the biomonitoring program required in Paragraph 62(b) will be conducted.

(dd)    "Supplemental Environmental Projects" or "SEPs" shall mean those commitments set forth in Section VII.

(ee)    "Surface Water Base Flow" shall mean any surface water flow at the Recovery System Site that is not in direct response to precipitation or snowmelt. The provisions of Paragraph 36 govern whether an observed flow is in "direct response."

(ff)    "Technical Dispute Representative" shall mean those persons designated for purposes of dispute resolution under Section XVI.

10

(gg)    "Trench Construction Standards" shall mean those minimum construction standards set forth in Paragraph 23.

**V.      PERFORMANCE OBLIGATIONS**

**A.      The Recovery System**

*1.      Site Acquisition and Governmental Approvals for Site Characterization*

17.    No later than sixty (60) days after entry of this Consent Decree, PNM shall either:

(a)    establish its right to enter and conduct operations—including securing any governmental approvals necessary to conduct Site Characterization—at the proposed location of the Recovery System shown on the map attached as Exhibit 1 to this document; or

(b)    inform Sierra Club in writing of: (i) its efforts to do so to that date; and (ii) each required task in the site acquisition or governmental approval process that remains uncompleted on that date.

If PNM has not completed its site acquisition and secured the necessary governmental approvals to conduct the Site Characterization within ninety (90) days after entry of this Consent Decree, PNM shall report to Sierra Club in writing on the status of its site acquisition and government approval efforts on the first business day of every month thereafter until the site acquisition and governmental approval work is complete.

18.    PNM is considering alternative locations for the Recovery System should it be unable to obtain such approvals or rights for the proposed location identified on Exhibit 1. If PNM determines that it is unable to obtain any necessary right of entry or governmental approvals for the proposed location of the Recovery System on commercially reasonable terms,

11

PNM shall immediately inform Sierra Club of that determination. The Parties shall thereafter attempt to agree on an alternative location for the Recovery System. With respect to each alternative location for the Recovery System to which the Parties may agree over time, PNM— and if necessary, as agreed upon by the Parties, SJCC—shall conduct any necessary site acquisition work and secure such approvals and rights and report to Sierra Club first within sixty (60) days of any new siting agreement and then regularly thereafter as described in Paragraph 17.

19. If the Parties are unable to agree under Paragraph 18 upon an alternative location for the Recovery System, or if the Parties agree at any point that there is no suitable, accessible location for the Recovery System, the Parties will meet in good faith to attempt to negotiate an alternative approach for managing alluvial groundwater flow and Surface Water Base Flow to achieve the objectives of this Consent Decree.

20. If the Recovery System cannot be constructed at the location identified in Exhibit 1, and if the Parties are unable to reach agreement on alternative locations under Paragraph 18 or if efforts to resolve the issues between the Parties under Paragraph 19 fail, the Parties agree to so inform the Court and to move jointly for: (a) rescission of the provisions of this Consent Decree that have not, as of the date of such motion, been fully implemented; and (b) reinstatement and adjudication of Sierra Club's complaint, provided, however, that in no case shall the right of reinstatement and adjudication extend to BHP Billiton, Ltd. or PNM Resources, Inc.

*2.*     ***Site Characterization and Formulation of Site-Specific Design Criteria***

21.     As quickly as practicable, but no later than one-hundred-twenty (120) days from the date on which the Companies' establish their right to enter and conduct operations at the proposed location of the Recovery System, PNM shall commence the necessary Site Characterization, including below surface testing, to develop the Design Criteria.

22.     The Design Criteria for the slurry wall shall implement the following minimum construction standards ("Slurry Wall Construction Standards"): (a) permeability of not greater than $10^{-7}$ cm/sec; (b) span the lateral locations shown in Exhibit 1; and (c) key into competent bedrock to a depth of three (3) feet or to the maximum practical penetration of the excavation equipment, whichever is less.

23.     The Design Criteria for the recovery trench shall implement the following minimum construction standards (the "Trench Construction Standards"): (a) span the lateral locations shown in Exhibit 1; (b) extend the recovery trench to not less than three (3) feet below the base of the alluvium or to the maximum practical penetration of the excavation equipment, whichever is less; (c) include a drain pipe positioned as near as practicable to the bottom of the excavated trench; (d) include pumping sumps at one or more low spots in the trench as conditions indicate; and (e) be located no more than thirty (30) feet upgradient of the slurry wall.

24.     The Design Criteria may deviate from the Slurry Wall Construction Standards or Trench Construction Standards when reasonably required, in the judgment of the Recovery System design engineer, pursuant to good engineering practices, based on site conditions, provided that no deviation or number of deviations shall excuse any failure of the Recovery System to meet the performance requirements specified in Paragraphs 31 through 36.

13

25.     If PNM determines that site conditions require deviation from the Slurry Wall Construction Standards or Trench Construction Standards, it shall immediately notify Sierra Club. No later than seven (7) business days after PNM transmits such notice, the Parties shall confer in good faith to agree on any necessary alternative Slurry Wall Construction Standards or Trench Construction Standards that are consistent with good engineering practices based on specific site conditions.

**3.     *The Recovery System Operations and Closure Plan***

26.     As quickly as practicable, but no later than sixty (60) days after completing the Site Characterization work described in Section V.A.2, PNM shall serve upon Sierra Club a proposed Operations and Closure Plan for the Recovery System in which SJCC concurs in writing, such concurrence not to be unreasonably withheld.

27.     PNM's proposed Operations and Closure Plan for the Recovery System shall include, at a minimum, the following information:

(a)     a map or set of maps, with appropriate references to the latitude and longitude of each boundary corner and each existing or proposed structure, showing: (i) the entire land area on which PNM proposes to construct, operate, and maintain the Recovery System, together with the buildings or facilities to be used; (ii) the road or roads by which PNM proposes to gain access to the Recovery System Site; (iii) the utility corridors that PNM proposes to use for access to the Recovery System Site; (iv) the structures, facilities, or areas where PNM proposes to transport surface water and alluvial groundwater from the Recovery System; (v) the location of

14

each facility that will remain on the Recovery System Site; and (vi) each contiguous tract of land adjacent to the Recovery System Site;

(b)     the name, address, telephone number, tax identification number, and resident agent of each entity that intends to construct, operate, or maintain the Recovery System, together with a statement as to whether each such entity is a corporation, partnership, single proprietorship, association, or other business entity;

(c)     a copy of the document(s) upon which PNM bases its legal right to enter and construct, operate, and maintain the Recovery System in the area or areas identified in the maps provided pursuant to subparagraph (a);

(d)     the commitment by PNM to self-insure construction, operation, and closure of the Recovery System for bodily injury and property damage;

(e)     a list of all licenses and permits needed to construct, operate, or maintain the Recovery System, which list shall identify each license or permit by: (i) type of permit or license; (ii) the name and address of the issuing authority; (iii) the identification numbers of the application for the permit or license or, if issued, the identification number of the permit or license; and (iv) if a permit decision has been made, the date of approval or disapproval by the issuing authority;

(f)     PNM's detailed and complete reports describing its Site Characterization and the proposed design, construction, operation, maintenance, and removal from service of the Recovery System;

(g)     a plan to: (i) install no fewer than three (3) piezometers screened from competent bedrock to no less than (1) one foot above the base of the alluvium no farther

15

than fifteen (15) feet downgradient of the slurry wall; (ii) install no fewer than three (3) piezometers screened to the base of the alluvium no farther than fifteen (15) feet upgradient of the slurry wall; and (iii) install an automated system for transporting recovered alluvial groundwater and surface water to a specific upgradient facility or set of facilities;

     (h)    a narrative description of the proposed construction, modification, use, maintenance, and removal from service of roads used in connection with the Recovery System, which shall at a minimum:

         (i)    identify as a "primary road" any road that will be frequently used for access to or other purposes related to the Recovery System for a period in excess of six (6) months or, alternatively, that will be retained after closure of the Recovery System ("Primary Road"), or certify that no road used in connection with the Recovery System will be frequently used for a period in excess of six (6) months or will be retained after closure of the Recovery System; and

         (ii)    identify as an ancillary road each road that is not a Primary Road ("Ancillary Road");

     (i)    for each road:

         (i)    an identification of appropriate limits for grade, width, surface materials, surface drainage control, culvert placement, and culvert size, so as to ensure environmental protection and safety appropriate for the planned duration and use, including consideration of the type and size of equipment used to construct the road;

16

(ii)     a detailed description of how each proposed road will be located, designed, constructed, reconstructed, used, maintained, and removed from service in a manner that controls or prevents erosion, siltation, and fugitive dust attendant to erosion by stabilizing all exposed surfaces in accordance with current, prudent engineering practices;

(iii)    a detailed description of how PNM will control or prevent damage to fish, wildlife, and their habitat as a result of the construction, use, and removal from service of each road;

(iv)    a detailed description of how PNM will control or prevent additional contributions of suspended solids to stream flow or runoff near the Recovery System as a result of the construction, use, and removal from service of each road;

(v)     a detailed description of how PNM will minimize the diminution to or degradation of the quality or quantity of surface and groundwater systems as a result of the construction, use, and removal from service of each road;

(vi)    a detailed description of how PNM will refrain from significantly altering the flow of water in streambeds or drainage channels as a result of the construction, use, and removal from service of each road;

(vii)   a certification that PNM will use nonacid- or nontoxic-forming substances in any road surfacing;

17

(viii)   a detailed description of how PNM will, except as necessary for the construction or closure of the Recovery System, not locate any part of any road in the channel of Westwater Arroyo or Shumway Arroyo;

(ix)   a detailed description of how PNM will timely remove from the Westwater and Shumway Arroyos any road or portions thereof that were used for the purposes of construction or closure of the Recovery System; and

(x)   a detailed description of how each road will be located to minimize downstream sedimentation and flooding;

(j)   for any Primary Road that is identified:

(i)   a detailed description of how PNM will locate such road, insofar as practical, on the most stable available surfaces;

(ii)   a detailed description of how PNM will maintain adequate drainage control to pass safely peak runoff from a 10-year, 6-hour (1.3 inches or greater) precipitation event;

(iii)   a detailed description of how PNM will avoid plugging or collapse and erosion at inlets and outlets as a result of the construction, use, and removal from service of any Primary Road;

(iv)   a detailed description of how PNM will prevent uncontrolled drainage over any Primary Road surface and embankment from drainage ditches associated with any Primary Road;

18

(v)   a detailed description of how PNM will sustain the vertical soil pressure, the passive resistance of the foundation, and the weight of vehicles using the road with respect to culverts associated with any Primary Road;

(vi)   a certification that the surfacing of each Primary Road shall be rock, crushed gravel, or asphalt; and

(vii)   a detailed description of how PNM will conduct routine maintenance to ensure all necessary and prudent repairs to the road surface, blading, filling of potholes, replacement of surfacing material, and, as necessary, revegetation, brush removal, and minor reconstruction of road segments; provided, however, that notwithstanding the foregoing, the existing roadway, commonly known as the "Red Gravel Road" which will be used for purposes of access to the Recovery System Site, shall not be construed or deemed to constitute a "Primary Road" for purposes of this Consent Decree;

(k)   a plan for protection of fish, wildlife, and their habitat which includes, at minimum:

(i)   a detailed description of how PNM will reasonably ensure that construction, operation, maintenance, and removal from service of the Recovery System will, to the extent reasonably possible, minimize disturbances and adverse impacts of the Recovery System on fish, wildlife, and their habitats;

(ii)   a detailed description of how PNM will reasonably ensure that construction, operation, maintenance, and removal from service of the Recovery System will not likely jeopardize the continued existence of endangered or

19

threatened species listed either by the Secretary of the Interior or the New Mexico Department of Game and Fish, or which are likely to result in the destruction or adverse modification of designated critical habitats of such species in violation of the Endangered Species Act of 1973, 16 U.S.C. §§ 1531–1544; and

(iii)     a detailed description of how PNM will reasonably prevent, control, and suppress range fires,

provided, however, that notwithstanding the foregoing, the Parties acknowledge that operation of the Recovery System is designed and intended to capture the presence of water and that changes in flora, fauna, and other environmental values that occur as a result of the capture and reduction of water as described above shall not constitute a failure to adhere to the requirements of this Consent Decree;

(l)     a plan for continuous monitoring (collected on an hourly basis) at the Recovery System of the following parameters: (i) surface water flow as required in Paragraph 35; (ii) groundwater levels in all piezometers as measured by pressure transducers, vibrating wire, or other similarly accurate methods; and (iii) the pumping rate of all recovery wells, which plan shall provide for the reporting to Sierra Club of the data obtained from such monitoring, and which monitoring data PNM shall maintain for not less than six (6) months;

(m)     a plan for the continuous monitoring (collected on an hourly basis) of pH, conductivity, and temperature in: (i) all water pumped from the Recovery System trench (as measured at a sampling point in the Recovery System pipeline following the confluence of all piping from the pumps associated with the Recovery System trench,

20

provided that the chosen sampling point shall measure only water pumped from the

Recovery System trench and not from any other source); and (ii) all water encountered in

the Recovery System culvert, which plan shall be consistent with the technical

requirements and limitations for the operation and maintenance of relevant monitoring

devices and systems, and shall provide for the reporting to Sierra Club of the data

obtained from the required continuous monitoring, and which monitoring data PNM shall

maintain for not less than six (6) months; and

(n)     a detailed plan and timetable for restoring the Recovery System Site in the

event that the Recovery System is removed from service pursuant to this Consent Decree,

including:

(i)     a detailed description of the proposed immediate use of the

Recovery System Site after removal of the Recovery System from service,

provided, however, that: (*a*) nothing in this Consent Decree shall operate to

restrict the use or development of the Recovery System Site after closure of the

Recovery System and restoration of the affected area pursuant to this Consent

Decree; and (*b*) the foregoing requirements shall not apply in the event that the

Recovery System Site is owned in fee exclusively by PNM, the San Juan

Participants, or some combination thereof;

(ii)     a statement of the consideration that PNM has given to restoring

the Recovery System Site in accordance with surface owner plans and applicable

state and local land use plans and programs, together with comments concerning

the proposed use by each of the legal or equitable owners of record of the surface

21

of the Recovery System Site and the state and local government agencies which would have to initiate, implement, approve, or authorize the proposed use of the Recovery System Site following its restoration, unless such owners and agencies fail to make such comments within thirty (30) days, provided, however, that the foregoing requirements shall not apply in the event that the Recovery System Site is owned in fee exclusively by PNM, the San Juan Participants, or some combination thereof;

(iii)   a plan for appropriate disposal of all debris, waste materials, and materials constituting a fire hazard;

(iv)   a plan, with appropriate cross sections and maps, for plugging, casing, or managing bore holes, wells, and other openings on the Recovery System Site;

(v)   a plan for complying with the requirements of the Clean Air Act, the Clean Water Act, and all other applicable air and water quality laws and regulations and health and safety standards, to the extent they apply to the Recovery System Site;

(vi)   a plan, with appropriate cross sections and maps, for the removal or renovation for permanent use of all sedimentation ponds, diversions, impoundments, and other facilities located on the Recovery System Site, if any, to meet criteria specified in the design plan for the permanent structures and impoundments;

22

(vii)   a plan for ensuring that waste materials are not buried or stored in proximity to a drainage course and for adequately covering of waste materials or combustible materials exposed, used, or produced during operation of the Recovery System;

(viii)   a plan for protecting and stabilizing all exposed surface areas on the Recovery System Site to effectively control erosion and dust attendant to erosion; and

(ix)   a plan for removing all equipment, structures, or other facilities located on the land surface associated with the Recovery System and not required for monitoring associated with the Recovery System or other post-closure activities at the Recovery System Site,

provided, however, that nothing in this Consent Decree shall require any entity to remove any subsurface structures or equipment or any facility that PNM designates for retention after closure of the Recovery System pursuant to Paragraph 27(a)(v).

28.   PNM shall be allowed to self-bond as a means of providing financial assurance for the construction, operation, and closure of the Recovery System Site. As a condition to such self-bonding, PNM shall, simultaneously with the Recovery System Operations and Closure Plan, serve on Sierra Club a Financial Assurance Plan which shall:

(a)   specify PNM's anticipated costs of: (i) constructing; (ii) operating; and (iii) removing the Recovery System from service, supported by itemized, written calculations and by copies of each executed or proposed contract concerning the performance of any work related to the construction or operation of the Recovery System;

23

(b)     identify an amount of financial assurance that is sufficient to assure the completion of: (i) construction of the Recovery System as specified in the Operations and Closure Plan; (ii) operation of the Recovery System as specified in the Operations and Closure Plan; and (iii) restoration of the Recovery System Site in accordance with the Operations and Closure Plan in the event that the work must be performed at this Court's direction; and

(c)     contain express provision for review and adjustment of the actual amount of financial assurance upon demonstration by PNM or Sierra Club that: (i) construction has been completed; (ii) the estimated cost of restoring the Recovery System Site has changed during the term of this Consent Decree; or (iii) PNM has fully complied with the Operations and Closure Plan following removal of the Recovery System from service pursuant to agreement of the Parties or dispute resolution under this Consent Decree. PNM shall be allowed to self-bond so long as it has the capacity to self-bond under the provisions of 40 C.F.R. Part 264 for the operations, maintenance, and closure of the Recovery System.

29.     Sierra Club shall have sixty (60) days after receipt of the proposed Operations and Closure Plan and Financial Assurance Plan to review each plan and either approve or disapprove one or both plans. Sierra Club's approval of these plans shall not be unreasonably withheld. In the event the Sierra Club fails to either approve or disapprove any plan within sixty (60) days of receipt, such plan shall be deemed approved. In the event that Sierra Club disapproves of any plan, Sierra Club shall provide the Companies with written notice of such disapproval which

24

shall specify, with particularity, each claimed deficiency and proposed measures, if possible, to resolve the claimed deficiencies.

30.     Following approval by Sierra Club of the Operations and Closure Plan pursuant to Paragraph 29 or as the result of Dispute Resolution proceedings, the Operations and Closure Plan may be amended only: (a) by agreement of the Parties; (b) as may be required by any governmental agency with jurisdiction (subject to Sierra Club's right to insist that PNM seek administrative or judicial review of such agency action); or (c) as required by good engineering or operational practices based on actual site conditions or system operations and performance. A party proposing to amend the Recovery System Operations and Closure Plan shall provide the other Parties with the proposed amendment and a detailed statement of the reasons for the proposed amendment.

## 4.     *Construction and Operation of the Recovery System*

31.     The Recovery System shall be constructed and operated in accordance with the approved Operations and Closure Plan and in a manner so that, on and after nine (9) months following commencement of its operation, the level of groundwater at the location of each pump placed in the recovery trench is maintained at or below the base of the alluvium at that location.

32.     The Recovery System shall be deemed acceptable for all purposes under this Consent Decree upon the first occurrence of at least one of the following conditions:

(a)     the spatial average of the water levels in the piezometers downstream of the slurry wall is equal to or less than one (1) foot above the base of the alluvium; or

(b)     the water level in the piezometer with the lowest screened interval
between the slurry wall and the recovery trench is at or below the base of the alluvium at
the location of the piezometer.

33.     If neither the condition in subparagraph 32(a) nor the condition in
subparagraph 32(b) is met and the spatial average water levels in the piezometers downstream of
the slurry wall cease to exhibit continuous decline, PNM shall assess the performance of the
Recovery System and take such measures as may be necessary to achieve and maintain the
conditions described in subparagraphs 32(a) or 32(b).

34.     The Parties acknowledge that the Recovery System is intended to, among other
things, induce infiltration of Surface Water Base Flow into the alluvium. To the extent that
Surface Water Base Flows continue or reoccur at the location of the slurry wall after one hundred
eighty (180) days following the commencement of operation of the Recovery System, PNM shall
within one hundred eighty (180) days thereafter capture, divert, or contain all Surface Water
Base Flow.

35.     Satisfactory management of surface water flow in direct response to precipitation
or snowmelt shall be established by documenting the flow of water in a culvert to be constructed
at the slurry wall in a manner that conveys all Surface Water Base Flow in the arroyo channel.
The flow of water in the culvert shall be continuously measured and recorded by instrumentation
designed for such purpose. In the event that Surface Water Base Flow in the arroyo channel
bypasses the culvert, PNM shall take all measures necessary to correct the bypass and ensure that
all Surface Water Base Flow enters the culvert.

26

36.     Beginning no later than one (1) year after commencement of operations of the Recovery System, PNM shall manage Surface Water Base Flow so that the flow of water in the culvert constructed at the Recovery System occurs only in direct response to precipitation or snowmelt. Flow of water in the culvert shall not continue more than forty-eight (48) hours after the cessation of flow at either of two surface water monitoring stations which the Companies shall establish on the Westwater and Shumway Arroyos, respectively, immediately upstream of all industrial activities. Flows that are observed only in the culvert and not in the upstream monitors and that are shown to be directly related to localized precipitation events shall not constitute unsatisfactory management of surface water.

## 5.     *Removal of the Recovery System from Service*

37.     Absent agreement on implementation of an Alternative Remedial Measure or set of Alternative Remedial Measures pursuant to Paragraph 45, PNM shall operate the Recovery System for a minimum of seven (7) years from the date on which the Recovery System commences operations. The Recovery System shall be operated until Sierra Club concurs in writing that the Recovery System can be removed from service, or dispute resolution results in a decision that one of the standards in subparagraphs (a) or (b) is met:

(a)     surface and alluvial groundwater monitoring for parameters set forth in this Consent Decree establishes that for a period of twelve (12) consecutive months: (i) no Surface Water Base Flow is present at the location of the Recovery System; and (ii) alluvial groundwater captured by the Recovery System occurs only in direct response to precipitation or snowmelt; or

27

(b)    the Companies demonstrate that conditions downstream of the Recovery System, measured at the location shown on Exhibit 2, do not or will not present an imminent and substantial endangerment to health or the environment as set forth at 42 U.S.C. § 6972(a)(1)(B) and applicable case law.

38.    In no case, however, shall PNM petition the Court for removal of the Recovery System from service under Paragraph 37(b) before seven (7) years from the commencement of operation of the Recovery System. The environmental conditions downstream or downgradient of the Recovery System at any location other than that indicated on Exhibit 2 shall not be used as a basis for Sierra Club to oppose any effort under Paragraph 37 by the Companies to remove the Recovery System from service or for any other purpose.

## 6.    *Additional Monitoring Provisions*

39.    PNM shall utilize one (1) of the San Juan Generating Station coal pile run-off caissons as a water quality monitoring well to be designated as RCB-1 and sampled for the parameters specified in the existing groundwater discharge permit for the San Juan Generating Station. Monitoring in RCB-1 shall be conducted monthly for one (1) year following the commencement of the operation of the Recovery System and quarterly thereafter. PNM shall provide Sierra Club a report of the results of each monitoring event for RCB-1 within five (5) business days of receipt of the results. Sierra Club may, at its sole expense, take samples from RCB-1 once every two (2) years for the parameters specified in the existing groundwater monitoring and observation plan for the San Juan Mine. Any such sampling shall be conducted during the third quarter of the calendar year for any year in which sampling by Sierra Club is permitted. Sierra Club shall provide the Companies a report of the results of each sampling event

28

for RCB-1 within five (5) business days of receipt of the results. The Companies may, at their sole expense, split samples with Sierra Club. The results of any sampling obtained by Sierra Club shall not be admissible in any litigation or regulatory proceeding, shall be maintained as confidential, and shall not be distributed to third parties.

40. No later than thirty (30) days after entry of this Consent Decree, PNM shall initiate all necessary actions to promptly obtain access and necessary governmental approvals for the installation of a remote sensing monitoring well to be designated as WWA-4BC at the location specified on Exhibit 3. Within ten (10) business days following final completion of WWA-4BC, including installation of the associated remote sensing equipment, PNM shall commence continuous monitoring (to be reported as daily composite averages) for water level, pH, conductivity, and temperature. PNM shall maintain the monitoring data from WWA-4BC for not less than six (6) months. The cost of the installation of WWA-4BC and associated equipment shall be included in the cost of the Recovery System for purposes of Paragraph 64. As PNM installs and completes WWA-4BC, PNM shall allow Sierra Club's representative to observe the installation and completion of the well consistent with the Parties' practice to date.

41. PNM shall identify and locate one surface flow monitoring station on the Westwater Arroyo upstream of any potential hydrologic influence from the San Juan Generating Station, and a second surface flow monitoring station on the Shumway Arroyo upstream of any potential hydrologic influence from the San Juan Mine. These stations shall be used to monitor and measure surface flow within the respective arroyos. PNM's proposed Operations and Closure Plan for the Recovery System shall include provisions for equipment installation and monitoring of these stations.

29

42.     As SJCC installs and completes Well SA-2 in accordance with Modification 2010-10 and 2010-14 to SJCC's SMCRA permit 2001-1 (Dec. 29, 2010), SJCC shall allow Sierra Club's representative to observe the installation and completion of the identified well consistent with the Parties' practice to date.

**B.     Investigation and Evaluation of Alternative Remedial Measures**

43.     No later than one hundred eighty (180) days after final completion of the Site Characterization, the Parties will meet to discuss, and agree upon, to the extent possible, an approach to be used in evaluating alternative remedial measures which would include, without limitation, the data, the model, the model assumptions, the boundary conditions, other variables, analytic methods, and effectiveness measures for the evaluation. Using this information, Sierra Club and the Companies shall thereafter each conduct an evaluation of alternative remedial measures that would permit the removal of the Recovery System.

44.     No later than twenty-four (24) months after final completion of the Site Characterization, Sierra Club and the Companies shall simultaneously exchange reports setting forth the results of each Party's respective evaluation of alternative remedial measures together with proposed performance standards for each Alternative Remedial Measure (collectively, "Alternative Remedial Measures").

45.     Within sixty (60) days of the exchange of reports pursuant to Paragraph 44, the Parties shall confer in person concerning their respective Alternative Remedial Measures. If the Parties agree upon an Alternative Remedial Measure or set of Alternative Remedial Measures that, if implemented, would allow PNM to remove the Recovery System from service, PNM

shall be entitled to remove the Recovery System from service upon implementation of the agreed Alternative Remedial Measure or set of Alternative Remedial Measures.

46.     If the Parties do not mutually agree upon an Alternative Remedial Measure or set of Alternative Remedial Measures, PNM shall continue to operate the Recovery System in accordance with the terms of this Consent Decree until: (a) the Parties subsequently agree on removal of the Recovery System from service; or (b) dispute resolution results in a decision that allows for the removal of the Recovery System from service.

## VI.   PERMITS

47.     The Companies intend that the Recovery System will be permitted under the New Mexico Water Quality Act and associated regulations.

48.     Nothing in this Consent Decree shall be construed as requiring review or approval by, or notice to, Sierra Club of any permit application or permit modification or revision application that does not concern or directly affect the operation of the Recovery System. In addition, Sierra Club shall not have any right under this Consent Decree to review, approve, or receive notice of any application for renewal, revision, modification, transfer, or assignment of any permit, license, or agreement that does not concern or directly affect the Recovery System. PNM shall provide Sierra Club with notice of Administrative Permit Amendments that concern or directly affect the Recovery System, but Sierra Club shall have no right to approve such Administrative Permit Amendment.

49.     PNM shall provide Sierra Club with a copy of each Permit Application before submitting it to the pertinent permitting authority. Sierra Club shall have twenty-eight (28) days after receipt to review the Permit Application to confirm that it does not materially conflict with

31

the requirements of this Consent Decree, the approved Operations and Closure Plan, or the Financial Assurance Plan (hereinafter collectively "Consent Decree Requirements"). If Sierra Club contends that the Permit Application materially conflicts with the Consent Decree Requirements, Sierra Club shall provide PNM written notice, which shall specify, with particularity: (a) each respect in which Sierra Club contends that the Permit Application materially conflicts with the Consent Decree Requirements; and (b) Sierra Club's proposed alternative language for resolving the claimed material conflict. If Sierra Club provides timely notice of a claimed material conflict, PNM shall refrain from filing the Permit Application until each of Sierra Club's claims are resolved through negotiations or as otherwise provided in this Consent Decree. PNM shall thereafter file the Permit Application in a form consistent with the agreement between PNM and Sierra Club or any dispute resolution order or orders. If Sierra Club fails to provide PNM with notice of a claimed material conflict within twenty-eight (28) days of receiving a particular Permit Application, it shall thereafter be precluded from objecting to that Permit Application and PNM may proceed with filing the Permit Application with the pertinent permitting authority.

50.     Upon filing any Permit Application, PNM shall simultaneously provide a copy to Sierra Club. After filing each Permit Application, the Companies shall promptly inform Sierra Club of: (a) each written communication that either or both of them receive from a permitting authority concerning that Permit Application; and (b) each written communication that they transmit to a permitting authority concerning that Permit Application. In addition, Sierra Club shall promptly inform the Companies of each written communication that Sierra Club or its agents, contractors, or representatives send or receive with any government agency with respect

to the permitting, operation, or closure of the Recovery System, or any issues under this Consent Decree.

51.     PNM shall neither make nor agree to any alteration or addition to a Permit Application without first obtaining the written concurrence of Sierra Club in each specific alteration or addition, such concurrence not to be unreasonably withheld. PNM shall provide Sierra Club written notice of any proposed alteration or addition to a Permit Application. Sierra Club shall have fourteen (14) days to review the proposed Permit Application alteration or addition. In the event that Sierra Club fails to respond to the written notice within fourteen (14) days, Sierra Club shall be deemed to concur in the proposed alteration or addition. Upon receiving Sierra Club's concurrence, whether in fact or by failure to timely respond, PNM shall modify the Permit Application only in strict accordance with the terms of the notice of proposed alteration or addition following such concurrence.

52.     PNM shall support each Permit Application as filed or as revised pursuant to this Consent Decree and it shall not indicate in any manner to any permitting authority that further revision of the Permit Application would be appropriate or acceptable to PNM, except with Sierra Club's written concurrence, which concurrence shall not be unreasonably withheld.

53.     If any permitting authority refuses to approve any Permit Application as filed or revised in accordance with this Consent Decree, PNM shall timely initiate any available proceedings for administrative review of the permitting authority's decision and shall support Sierra Club's intervention and participation in such review.

54.     If administrative review is unavailable with respect to any decision to deny a Permit Application as filed or revised in accordance with this Consent Decree, or if an

33

administrative review tribunal affirms any decision of a permitting authority to deny a Permit Application as filed or revised, PNM shall timely seek judicial review and shall support Sierra Club's intervention and participation in the proceeding.

55.     PNM shall prosecute each such action for judicial review until: (a) the decision to deny a Permit Application is vacated or reversed by final, unappealable order; or (b) the highest court authorized to conduct judicial review or hear appeals from judicial review decisions affirms denial of the permit at issue.

56.     If the highest court authorized to conduct judicial review or hear appeals from judicial review decisions affirms a final administrative decision denying a Permit Application or vacating a permit required for the Recovery System, PNM shall elect to either: (a) proceed under Paragraph 20; or (b) within one-hundred-twenty (120) days of the entry of such decision, present to Sierra Club a revised Permit Application.

57.     The Parties shall thereafter process the proposed revised Permit Application in accordance with Paragraphs 49 through 56 as circumstances may require and, if necessary, with this Paragraph until the required permit in some agreed form is approved and, if challenged, is upheld on review.

58.     After issuance of each permit or permit modification that authorizes PNM to construct or operate the Recovery System, PNM shall not without Sierra Club's written concurrence, which concurrence shall not be unreasonably withheld, apply for or acquiesce in further modification of the permit for the Recovery System, subject to the limitations of Paragraph 48.

59.     During the term of this Consent Decree, SJCC shall not apply for or acquiesce in any alteration of the conditions incorporated in Modification 2010-10 and 2010-14 to SJCC's SMCRA permit 2001-1 (Dec. 29, 2010) without Sierra Club's written concurrence, which concurrence shall not be unreasonably withheld, provided, however, that if SJCC does not receive Sierra Club's written response within ten (10) business days after Sierra Club receives written notice of the proposed alteration, SJCC may proceed without Sierra Club's written concurrence. After the term of this Consent Decree while the Recovery System may be operating, SJCC shall not so apply or acquiesce without having provided at least 10 (ten) business days' prior written notice to Sierra Club.

60.     During the pendency of any administrative consideration of a permit application and any challenge to any permit for the Site Characterization, construction, or operation of the Recovery System, the applicable obligations of the Companies under this Consent Decree shall be stayed until the final resolution of the consideration or challenge.

**VII.   SUPPLEMENTAL ENVIRONMENTAL PROJECTS**

61.     The Companies shall fund the supplemental environmental projects ("SEPs") identified in Exhibit 4 in the total amount of $1,000,000.

**VIII.  ENVIRONMENTAL RESTORATION PROJECTS**

62.     Subject to the provisions and limitations of Paragraphs 63 and 64, the Companies shall undertake the following environmental restoration projects ("Environmental Restoration Projects") in the order set forth below:

(a)     PNM shall construct and operate the Raw Water Reservoir Recovery System. The purpose of the Raw Water Reservoir Recovery System is to reduce water

35

from the San Juan Raw Water Reservoir that may enter the alluvium. The specific

placement, design, specification, construction, operation, and maintenance of the Raw

Water Reservoir Recovery System shall be conducted in accordance with PNM's

reasonable judgment and discretion to accomplish the purpose set forth above.

(b)     Within one (1) year following the commencement of the operation of the

Recovery System, the Companies shall undertake a ten (10) year biomonitoring program

in the Shumway and Westwater Arroyos downstream of the Recovery System to the

location noted on Exhibit 2 ("the Study Area"). The biomonitoring program shall be

designed to identify and monitor the biotic resources in the Study Area as the Companies

implement the requirements of this Consent Decree. The biomonitoring program shall be

implemented through same-season annual biotic field surveys of the Study Area by a

qualified environmental scientist—to be selected by the Companies in consultation with

Sierra Club—and the preparation of and provision to Sierra Club of an annual report

describing the results of the field survey as well as significant changes in biota, if any,

from conditions identified as of the commencement date of the biomonitoring program in

the Study Area. The purpose of the biomonitoring program is informative only, and shall

not be used by Sierra Club for any other purpose.

(c)     Upon completion of the project under Paragraph 62(a) and

commencement of the project under Paragraph 62(b), and subject to the limitations in

Paragraph 64, PNM shall undertake the Environmental Restoration Projects identified in

Exhibit 5.

36

63.     The Companies shall expend no less than $1,000,000 on the projects provided for in this Section, subject to the potential upward adjustment set forth in Paragraph 64.

64.     The Companies estimate that the Recovery System Cost should be no more than $5,300,000 but may be as much as $6,000,000. To the extent the Recovery System Cost is less than $6,000,000 the Companies shall expend unused funds up to an additional $1,700,000 on the Environmental Restoration Projects set forth in this Section.

65.     PNM shall provide to Sierra Club written accounting statements, prepared in accordance with generally accepted accounting principles ("GAAP"), of all expenditures comprising the Recovery System Cost, and for all expenditures related to the Environmental Restoration Projects undertaken pursuant to this Section. PNM shall provide the accounting statements required by this paragraph at the following intervals: (a) six (6) months after entry of the Consent Decree; (b) one (1) year after entry of this Consent Decree; and (c) on each subsequent anniversary of the entry of this Consent Decree through termination. Sierra Club shall have the right to request in writing, up to two times per year for the first two years of the Consent Decree, the cost of a specific expenditure or expenditures in order to ascertain expenditures made by the Companies pursuant to Paragraphs 62 through 64.

## IX.     ACCESS, RECORDKEEPING, AND REPORTING

### A.     Sierra Club's Site Access

66.     Up to three (3) of Sierra Club's designated representatives shall be allowed escorted access to the Recovery System Site and the Westwater Arroyo and Shumway Arroyo as specified below only in the following circumstances and for the following purposes:

37

(a)     upon a minimum of forty-eight (48) hours written notice to each of the Companies, access to the Recovery System Site for the sole purpose of observing and evaluating site assessment and construction related to the Recovery System on each day during which such activities occur;

(b)     upon a minimum of forty-eight (48) hours written notice to each of the Companies, once on one (1) day during or after any precipitation event of Sierra Club's choosing, for the purpose of observing and evaluating the impact, if any, of the said precipitation event on the construction or operation of the Recovery System and on flows to or within the Recovery System surface water culvert installed pursuant to Paragraph 35, provided that Sierra Club's representative shall have access to the Recovery System Site pursuant to this subparagraph no more than twice;

(c)     upon a minimum of forty-eight (48) hours written notice to each of the Companies, once per calendar month during the first year after commencement of operation of the Recovery System, for the purpose of observing the operation of the Recovery System and the Westwater and Shumway Arroyo system from the most upstream monitoring station installed pursuant to Paragraphs 40 through 42 on each arroyo to the first piezometer downstream of the Recovery System at which either Company has the right or privilege of access;

(d)     upon a minimum of forty-eight (48) hours written notice to each of the Companies, once per two (2) calendar months during the second year after commencement of operation of the Recovery System, for the purpose of observing the operation of the Recovery System and the Westwater and Shumway Arroyo system from

38

the most upstream monitoring station installed pursuant to Paragraphs 40 through 42 on each arroyo to the first piezometer downstream of the Recovery System installed pursuant to Paragraph 27(g)(i);

(e)     thereafter during operation of the Recovery System, upon a minimum one (1) week's written notice, once every calendar quarter, for the purpose of observing and evaluating the operation of the Recovery System and the Westwater and Shumway Arroyo system from the most upstream monitoring station installed pursuant to Paragraphs 40 through 42 on each arroyo to the first piezometer downstream of the Recovery System at which either Company has the right or privilege of access; and

(f)     if PNM fails to comply with its duty to operate the Recovery System in accordance with the Operations and Closure Plan, Sierra Club's right of access to the entire Recovery System Site—and if pertinent, to the Westwater or Shumway Arroyos— for three (3) months following each such failure, shall be as described in subparagraph (c), without regard to elapsed time since commencement of operation of the Recovery System, provided however, that for purposes of this subparagraph only, PNM's failure to meet any reporting deadline shall not constitute a failure to operate the Recovery System in accordance with the Operations and Closure Plan.

Sierra Club may satisfy the written notice requirements of this Paragraph by transmitting an electronic mail message in accordance with Section XVIII stating an intention to exercise access rights on a specific day or set of days, such notice also to be electronically copied to a designated email address to be provided in writing by the Companies to Sierra Club after entry of this Consent Decree.

67.     During any site visit, Sierra Club's designated representatives shall have the right to take field measurements of surface water or groundwater samples collected by the Companies, using a YSI (or equivalent) meter properly calibrated to the manufacturer's specifications and undertaken for observational purposes only. Any field measurements obtained by Sierra Club's designated representatives shall not be admissible in any litigation or regulatory proceeding, shall be maintained as confidential, and shall not be distributed to any third parties.

68.     All written notices for access shall include the date and time for the requested access and identify the Sierra Club representative(s) for whom access is being requested. During all periods of access, Sierra Club's designated representative(s) shall comply with all applicable health, safety, and environmental laws and regulations and the Companies' health and safety, facility procedures, and confidentiality requirements applicable to contractors at the Facilities. All access by Sierra Club's designated representative(s) to the Recovery System Site shall require escort from one or both of the Companies. Sierra Club's access rights shall terminate upon the closure of the Recovery System in accordance with this Consent Decree.

69.     As a condition for access as provided under this Consent Decree, Sierra Club's designated representatives shall sign a written release and indemnity agreement acknowledging that: (a) the areas of permitted access may include construction, mining, and other industrial activities which present inherent hazards and that the designated representatives accept the risks inherent in these activities; (b) Sierra Club's designated representatives shall indemnify and hold the Companies and their respective contractors harmless for any injury or damage to person or property caused by the gross negligence or intentional acts or omissions of the designated representatives; (c) the obligation of the Sierra Club's designated representative to indemnify and

40

hold harmless the Companies shall not extend to negligence or intentional acts of the Companies; and (d) the Companies will neither indemnify nor hold harmless the Sierra Club's designated representative for any injury or damage to person or property caused by negligence or intentional acts of the designated representative.

70.     Sierra Club's designated representatives shall conform to the following requirements when visiting the San Juan Mine.

(a)     Before a Sierra Club representative will be allowed access to the San Juan Mine property, the representative must provide written evidence to SJCC safety officials of the completion of site specific hazard training (such training to consist of an approximately one-hour training to be provided on-site by SJCC safety officials pursuant to 30 C.F.R. § 48.31, at no cost to the representative or to Sierra Club).

(b)     If any Sierra Club representative intends to access the property on more than five (5) occasions or has accessed the property on more than five (5) occasions in a 12-month period, such representative must, before accessing or re-accessing the property, provide to SJCC safety officials written evidence of the completion of MSHA training in accordance with 30 C.F.R. Part 48.

(c)     Sierra Club's representative(s) must wear hard-toed boots at any time the representative is on mine property. SJCC safety officials can provide MSHA-certified hard hats, safety glasses, and reflective vests if necessary.

(d)     The Sierra Club representative will not be allowed to drive a non-mine vehicle on the San Juan Mine property. Personal vehicles must be left in the designated visitor parking area, and SJCC safety officials will transport the Sierra Club

41

representative to the mine property location at which the work to be observed is to be performed.

(e)     The Sierra Club representative will be provided with an area of access to the San Juan Mine property that is suitable to the purposes for which access is allowed, but which is also consistent with safety requirements. Sierra Club's representative must remain within the delineated access areas, and follow the safety-related instructions of SJCC safety officials at all times.

(f)     The Sierra Club representative will be allowed to take photographs that are directly relevant to the activities being observed, but will in no case be allowed to take photographs of SJCC employees or SJCC equipment unless the equipment is incidentally in the background of an otherwise relevant photograph.

71.     Sierra Club's designated representatives shall conform to the following requirements when visiting the Recovery System Site and Westwater Arroyo:

(a)     all applicable workplace safety laws and regulations;

(b)     all health, safety, and training requirements that are applicable to PNM contractors as required for access to the San Juan Generating Station as may be amended from time to time; and

(c)     all insurance requirements that are applicable to PNM contractors as required for access to the San Juan Generating Station as may be amended from time to time.

**B.     Exchange of Information**

72.     The Companies shall simultaneously provide Sierra Club with copies of any reports submitted to federal or state regulatory agencies in connection with: (a) the operation of the Recovery System; and (b) water quality monitoring required as a condition of SJCC's mining permit. The Companies shall provide the reports in the same format in which they are transmitted to such agencies, which shall be either in print or in an electronic format readable by commercially-available computer software.

73.     The Companies will endeavor to provide Sierra Club with electronic copies of Recovery System Site Characterization data within two (2) working days of obtaining it, but they shall do so no later than five (5) working days after obtaining it.

74.     During Site Characterization activities, the Parties will exchange on a weekly basis the field notes recorded by each Party's respective field representatives during such activities. The Parties will designate their respective representative charged with preparing and maintaining field notes covering the Site Characterization activities. Sierra Club's representative will provide on a weekly basis to the Companies' designated representatives copies of photographs, if any, taken by the Sierra Club representative while at the Facilities.

75.     Within one (1) week from entry of this Consent Decree, SJCC will provide to Sierra Club all non-privileged field notes not provided to Sierra Club as of December 21, 2011, if any, concerning site conditions prepared by each of its employees or agents during the site assessment and well installation activities conducted pursuant to SJCC's implementation of the "second supplemental monitoring plan" identified in the Parties "Confidential Memorandum of Agreement" dated October 25, 2010.

## X.    RECOVERY FOR CONSENT DECREE COSTS

76.    Sierra Club acknowledges that PNM and some or all of the San Juan Participants may seek funding approval for and/or recovery of, in customer rates or otherwise, some or all of the costs incurred under this Consent Decree ("Consent Decree Costs"). Sierra Club covenants and agrees that it shall not oppose or challenge the approval of any funding for or recovery of any Consent Decree Costs in any administrative or judicial proceeding. Sierra Club further covenants and agrees that it shall not participate in or fund any other organization or association that seeks to oppose or challenge the approval of any funding for or recovery of any Consent Decree Costs in any administrative or judicial proceeding. The restrictions herein do not extend to any administrative or judicial proceeding involving issues that do not relate to the Consent Decree Costs.

## XI.    RESOLUTION OF CLAIMS

77.    This Consent Decree resolves and releases Defendants and the San Juan Participants from all civil claims that have been brought or could have been brought against the Defendants and the San Juan Participants arising under RCRA, SMCRA, CWA or any other statute or common law, from any act or omission related to: (a) the mining, use, and placement of coal and coal combustion byproducts at the Facilities; (b) the management, release, or discharge of water at or from the Facilities that may have impacted property, surface water, or alluvial or other groundwater in any location, including but not limited to the Shumway and Westwater Arroyos; and (c) any allegation that was made, or that could have been made, in the Lawsuit that occurred prior to the date of entry of this Consent Decree.

44

78.     Sierra Club further covenants not to issue a notice of intent to sue with respect to, initiate, commence, finance, or participate in any administrative or judicial action with respect to any claim based on Laws as existing on the date of the lodging of this Consent Decree and arising from any act or omission undertaken within the reasonable scope of practices of the Companies current as of the date the Lawsuit was filed:

(a)     with respect to the placement of coal and coal combustion byproducts at the San Juan Mine;

(b)     with respect to the generation, handling, and storage of coal combustion byproducts and the handling and storage of coal at the San Juan Generating Station;

(c)     with respect to the management, release, or discharge of water at or from the Facilities to the extent the water does or is alleged to come into contact with coal or coal combustion byproducts;

(d)     with respect to any water management and water storage processes or practices employed or in existence at the Facilities as of the date the Lawsuit was filed;

(e)     with respect to any alleged impact on the hydrologic balance from water management or storage at the Facilities to the extent such impact is related to any acts or omissions as of the date the Lawsuit was filed;

(f)     with respect to any act required to be undertaken under and in accordance with the provisions of this Consent Decree; and

(g)     by a regulatory agency regarding the foregoing activities,

45

that occurs on or after the date of entry of this Consent Decree provided the Companies are not found, after exhaustion of all appeal opportunities, to have violated one or more material terms of this Consent Decree.

## XII.   ATTORNEYS' FEES AND COSTS

79.     Within thirty-five (35) days of entry of this Consent Decree, the Companies will pay Sierra Club $1,650,000 in attorney and expert fees and costs incurred through entry of this Consent Decree. Sierra Club's attorneys and experts shall be solely responsible for any taxes that may be applicable to such fees and costs. The Parties agree that any agreed amounts paid to Sierra Club for attorneys' fees, consultant fees, and litigation costs under this Consent Decree were the result of the settlement of a disputed and unliquidated claim, based on the unique factors in the Lawsuit, and that such agreed amounts shall not serve as precedent for any other fees or costs for which Sierra Club may hereafter seek recovery pursuant to this Consent Decree or in any other action against PNM, PNM Resources, Inc., BHP Billiton New Mexico Coal Company, Inc. or its subsidiaries, or any of the San Juan Participants.

80.     The Companies will pay Sierra Club $500,000 in full payment of attorneys' and experts' fees incurred after entry of this Consent Decree for any and all costs and expenses associated with the implementation and monitoring of this Consent Decree. Sierra Club's attorneys and experts shall be solely responsible for any taxes that may be applicable to such fees and costs. The Companies shall pay Sierra Club $250,000 within six (6) months of entry of this Consent Decree, and the balance of $250,000 within eighteen (18) months of entry of this Consent Decree.

81.     All payments made under this Section shall be made by electronic funds transfer ("EFT") to an account to be identified by Sierra Club in writing within ten (10) days of entry of this Consent Decree, in accordance with current EFT procedures. The costs of such EFT shall be the responsibility of the Companies. At the time of payment, the Companies shall provide notice of payment in accordance with Section XVIII.

## XIII.  CONFIDENTIALITY PROVISIONS

82.     The Parties and their agents, contractors, consultants and designated representatives shall not, without the written consent of the other Parties, disclose any field notes, data, photographs, reports, emails, memoranda, conversations, or other information received, collected, or provided by the Parties as a result of the negotiations related this Consent Decree or any activities permitted under this Consent Decree to any regulatory agencies or third parties, and this information shall not be used for any purposes other than as specifically set forth in this Consent Decree; provided however, that the provisions of this Paragraph shall not apply to information that is in the public domain through means other than by breach of this Consent Decree. In addition, PNM may provide such information to the San Juan Participants with the understanding that any such information shall be maintained by them as confidential in accordance with the terms of this Decree.

83.     Entry of this Consent Decree is conditioned on the receipt by the Companies of nondisclosure agreements executed by the Western Environmental Law Center and the Environmental Integrity Project ("EIP"), in which those entities shall adhere to the nondisclosure and confidentiality provisions in this Consent Decree concerning any Settlement Information or confidential data or information collected or provided to such entities during the activities related

47

to the negotiations among the parties and the entry of this Consent Decree. Each entity shall be separately responsible for compliance with the nondisclosure and confidentiality provisions set forth herein and included in the relevant nondisclosure agreement.

84.     The Parties' agreements concerning settlement negotiations and the Settlement Information under the letter agreements of May 21 and 27, 2010, shall remain in effect following the entry of this Consent Decree.

## XIV.   MODIFICATION AND TRANSFERABILITY

85.     The terms of this Consent Decree may be modified only by a subsequent written agreement signed by the Parties. The Parties may, without Court approval, mutually agree to extend any deadline under this Consent Decree by not more than sixty (60) days. Where the modification constitutes a material change to this Consent Decree, it shall be effective only upon approval by the Court.

86.     If PNM or SJCC proposes to sell or assign all or part of their respective ownership interests in the Facilities or the Recovery System Site, as may be applicable, the selling or assigning entity shall provide a copy of this Consent Decree to the prospective purchaser or assignee. The selling or transferring entity shall provide written notice of the proposed sale or assignment to the other Parties at least thirty (30) days before completion of the sale or assignment. The sale or assignment of all or part of the Facilities or the Recovery System Site shall not relieve the selling or transferring entity of its obligations to perform under this Consent Decree unless agreed to by the Parties through a modification to this Consent Decree under Paragraph 85. Nothing in this Consent Decree shall be construed as: (a) requiring consent or approval of the Sierra Club or the Court for any sale or transfer of any interest in the Facilities

or Recovery System Site; or (b) limiting the rights of the Companies to assign or encumber their respective interests in the Facilities or Recovery System Site solely for purposes of securing any indebtedness or other obligation.

## XV.   RETENTION OF JURISDICTION

87.     This Court shall retain jurisdiction of the Lawsuit after entry of this Consent Decree to enforce compliance with the terms and conditions of this Consent Decree and to take any action necessary or appropriate for its interpretation, construction, execution, modification, or adjudication of disputes. Subject to the provisions of Section XVI, during the term of this Consent Decree, any Party may apply to this Court for any relief necessary to construe or effectuate this Consent Decree. After the Consent Decree is terminated pursuant to the provisions of Section XVII, the Court shall retain jurisdiction for the limited purpose of adjudicating any dispute concerning the removal of the Recovery System from service.

88.     Plaintiff and Defendants reserve all legal and equitable rights and defenses available to them to enforce or defend the provisions of this Consent Decree.

## XVI.  DISPUTE RESOLUTION

89.     The dispute resolution procedure provided by this Section shall be available to resolve all disputes arising under this Consent Decree unless a provision of this Consent Decree expressly precludes the use of dispute resolution. With respect to any dispute arising under this Consent Decree, this Consent Decree shall be interpreted to achieve objectives hereunder in a reasonable, cost effective, and technically practical manner.

90.     In the event that Sierra Club, any person or organization purporting to act on behalf of Sierra Club, or any person or organization financed by Sierra Club is alleged to have

49

acted contrary to the provisions of Paragraph 78 (Resolution of Claims) or Section X (Recovery for Consent Decree Costs), the Companies shall—prior to commencing any dispute resolution proceedings under this Section—provide Sierra Club written notice of, and a thirty (30) day opportunity to cure, any such alleged breach. In the event of any such notice, Sierra Club will cooperate with the Companies to have any such action withdrawn or dismissed. In no event shall any Party seek money damages for any breach of the provisions of this Paragraph, though the Court will retain its full authority to enforce the provisions of this Consent Decree by injunctive relief or otherwise. If Sierra Club has not cured the alleged breach to the satisfaction of the aggrieved Party by the expiration of the thirty (30) day period, such alleged breach shall be subject to the dispute resolution procedures of Paragraphs 91 through 97.

91.     The dispute resolution procedure required herein shall be invoked by one Party giving written notice to the other Parties advising of a dispute pursuant to this Section. The written notice shall: (a) describe the nature of the dispute; (b) identify the provisions of the Consent Decree which are in dispute; (c) provide a summary of the noticing Party's legal argument concerning the dispute; and (d) provide a summary of the noticing Party's technical arguments, if any, concerning the dispute. The Parties receiving such a notice shall acknowledge receipt of the notice, and the Parties in dispute shall expeditiously schedule a meeting to discuss the dispute informally not later than fourteen (14) days following receipt of such written notice.

92.     Disputes submitted to dispute resolution under this Section shall be the subject of informal negotiations among the disputing Parties within a reasonable period of time not to exceed thirty (30) days from the date of the first meeting among the disputing Parties' representatives.

93.    If the disputing Parties are unable to reach agreement during the period of time set forth in Paragraph 92 and the dispute is of a technical nature, each Party shall within a reasonable period of time not to exceed thirty (30) days after the expiration of the period of time set forth in Paragraph 92 identify in writing a technical representative (the "Technical Dispute Representative") to review any issues in dispute. Within twenty-one (21) days of their appointment under this Paragraph, the disputing Parties' Technical Dispute Representatives shall prepare and provide to the other disputing Parties a written explanation of that Party's position. The Technical Dispute Representatives shall meet in person within thirty (30) days of their appointment under this Paragraph and attempt to resolve the dispute informally.

94.    If the disputing Parties are unable to reach agreement during the periods of time set forth in Paragraphs 91 through 93 as applicable, the Party invoking the dispute resolution proceedings under Paragraph 91 shall have the right file with the Court within thirty (30) days a Petition for Dispute Resolution, which shall: (a) include a detailed statement of the dispute; (b) identify the provisions of the Consent Decree that are in dispute; (c) provide the petitioner's argument concerning the dispute; (d) set forth the petitioner's proposal for the process and timing for adjudication of the dispute along with a specific request for relief that would satisfy the petitioning Party. The other disputing Parties may respond to the Petition for Dispute Resolution within thirty (30) days of filing. The petitioner shall have the right to file a reply within fourteen (14) days of the response, and in such case, the other disputing Parties shall have the right to file a sur-reply within fourteen (14) days of the reply. In each Petition for Dispute Resolution, a party may request an evidentiary hearing on the dispute and suggest that the Court refer the dispute to a magistrate judge or special master at the discretion of the Court.

51

95.     Where the nature of the dispute is such that a more timely resolution of the issue is required, the time periods set out in this Section may be modified upon mutual written agreement of the disputing Parties or by motion of one of the Parties to the dispute.

96.     This Court shall not draw any inferences nor establish any presumptions adverse to any disputing Party as a result of invocation of this Section or the disputing Parties' inability to reach agreement.

97.     Any requirement of this Consent Decree that is subject to or dependent upon the resolution of a particular dispute shall be held in abeyance pending the outcome of dispute resolution.

## XVII. TERMINATION OF CONSENT DECREE

98.     This Consent Decree shall terminate upon the first occurrence of any of the following: (a) the conditions for the removal of the Recovery System from service are met under this Consent Decree and the Supplemental Environmental Projects and Environmental Restoration Projects have been completed; or (b) ten (10) years from the date of entry of this Consent Decree. In the event that the Companies have not satisfied the conditions for removal of the Recovery System from service within ten (10) years of the date of entry of this Consent Decree, this Consent Decree shall nonetheless terminate, but the Companies shall continue operating the Recovery System until such time as the parties agree to the removal of the Recovery System from service or until an order of the Court.

99.     The provisions of Paragraph 78 (Resolution of Claims) shall remain in full force and effect for as long as the Recovery System remains in service.

100.    The provisions of Section XVI (Dispute Resolution) shall survive the termination

of this Consent Decree only for purposes of: (a) a petition by the Companies to the Court for the

removal of the Recovery System from Service; and (b) a petition by Sierra Club for specific

performance of the requirements of this Consent Decree related to operation and maintenance of

the Recovery System or removal from service.

## XVIII. NOTICES

101.    Unless otherwise provided herein, whenever notifications, communications, or

submissions are required by this Consent Decree, they shall be made in writing and addressed as

follows:

**As to Sierra Club:**

Peter Morgan
Associate Attorney
1650 38th St., Suite 102W
Boulder, CO 80301

Charles M. Tebbutt
Law Offices of Charles M. Tebbutt, P.C.
451 Blair Blvd.
Eugene, OR 97402

**As to San Juan Coal Company:**

Brent Musslewhite
Director, Environmental
300 West Arrington, Suite 200
Farmington, NM 87401

Charles E. Roybal
Senior Counsel
300 West Arrington, Suite 200
Farmington, NM 87401

**As to Public Service of New Mexico:**

Michael Goen
San Juan Generating Station, MS 96EO
6800 North County Road
Waterflow, NM 87421
(for purposes of communications and notices
pursuant to Sections IX.A and IX.B, only)

Carol Graebner
Deputy General Counsel
Alvarado Square, MS 1200
Albuquerque, NM 87158
(for purposes of all communications and
notices except those pursuant to Sections IX.A
and IX.B)

53

102.    All notifications, communications, or submissions made pursuant to this Section shall be sent either by: (a) overnight mail or delivery service; (b) certified or registered mail, return receipt requested; or (c) electronic mail with a proof of delivery receipt certificate requested. All notifications, communications, and transmissions: (y) sent by overnight, certified, or registered mail shall be deemed submitted on the date they are postmarked; or (z) sent by overnight delivery service shall be deemed submitted on the date they are delivered to the delivery service. All notifications, communications, and submissions made by electronic mail shall be deemed submitted on the date electronically transmitted, and the transmitting Party shall be responsible for maintaining and producing upon request to any Party the returned electronic proof of delivery receipt certificate. The Parties shall exchange designated email addresses to be used in accordance with this Section no later than three (3) business days after entry of this Consent Decree.

103.    Any Party may change either the notice recipient or the address for providing notices to it by serving the other Parties with a notice setting forth such new notice recipient or address.

## XIX.   FORCE MAJEURE

104.    For purposes of this Consent Decree, a "Force Majeure Event" shall mean an event that has been or will be caused by circumstances beyond the control of any Party, or any of them, or their respective contractors, or any entity controlled by any of them, that delays or prevents performance of any provision of this Consent Decree despite the Party's best efforts to fulfill the obligation. "Best efforts to fulfill the obligation" include using due diligence to anticipate any potential Force Majeure Event and to address the effects of any such event (a) as it

54

is occurring and (b) after it has occurred, such that the delay or non-compliance is minimized to the greatest extent possible. Such delay in or failure of performance shall not be deemed a violation of this Consent Decree during the duration of the circumstances that give rise to the Force Majeure Event.

105.    The Parties agree that, depending upon the circumstances related to an event and any Party's response to such circumstances, the kinds of events listed below are among those that could qualify as Force Majeure Events within the meaning of this Section: construction, labor, or equipment delays; equipment failures; acts of God; acts of war, civil insurrection, or terrorism; and restraint by court or government agency. Depending upon the circumstances and the Companies' response to such circumstances, failure of a permitting authority to issue a necessary permit in a timely fashion may constitute a Force Majeure Event where the failure of the permitting authority to act is beyond the control of the Companies and the Companies have taken all reasonable actions to obtain the necessary permit, including, but not limited to: complying with Section VI; submitting a complete permit application; responding to requests for additional information by the permitting authority in a timely fashion; and accepting lawful permit terms and conditions after expeditiously exhausting any legal rights to appeal terms and conditions imposed by the permitting authority, provided that the Companies shall not be precluded from asserting that a new Force Majeure Event has caused or may cause a new or additional delay in complying with the extended or modified schedule. Except as limited by the terms of this Consent Decree, unanticipated or increased costs or expenses associated with the performance of the Companies' obligations under this Consent Decree shall not constitute a Force Majeure Event. Nothing in this Consent Decree shall be construed as requiring the Companies to resolve

55

any labor strike or labor slowdown as a condition to invoking or claiming the existence of a
Force Majeure Event.

106.    If any event occurs or has occurred that may delay or prevent performance of any
obligation under this Consent Decree, as to which any Party intends to assert a claim of Force
Majeure, the claiming Party shall assert the claim of Force Majeure to the other Parties in writing
as soon as practicable, but in no event later than ten (10) business days following the date the
claiming Party first knew of the claimed Force Majeure Event. In this notice, the claiming Party
shall reference this Paragraph and describe the anticipated length of time that the delay or
prevention of performance may persist, the cause or causes of the delay or prevention of
performance, all measures taken or to be taken by the claiming Party to prevent or minimize the
delay or prevention of performance, the schedule by which the claiming Party proposes to
implement those measures, and the Party's rationale for attributing a delay or prevention of
performance to a Force Majeure Event. The Parties shall adopt all reasonable measures to avoid
or minimize such delays or prevention of performance.

107.    Any Party shall notify the other Parties in writing if it does not accept the Party's
claim of Force Majeure within ten (10) days of receipt of the notice asserting the claim provided
under Paragraph 106. Failure by a Party to provide such timely notice shall be deemed
acceptance of the claim. If the Parties agree that a delay in performance has been or will be
caused by a Force Majeure Event, the Parties shall stipulate to an extension of deadline(s) for
performance of the affected compliance requirement(s) by a period equal to the delay actually
caused by the event. In such circumstances, an appropriate modification shall be made pursuant
to Paragraph 85.

108.    If a Party does not accept another Party's claim of Force Majeure, or if the Parties cannot agree on the length of the delay actually caused by the Force Majeure Event, the matter shall be resolved in accordance with Section XVI.

109.    In any dispute regarding Force Majeure, the Party claiming the Force Majeure event shall bear the burden of proving that any delay in or prevention of performance was caused by or will be caused by a Force Majeure Event. The claiming Party shall also bear the burden of proving that the claiming Party gave the notice required by Paragraph 106. An extension of one compliance date based on a particular event may, but will not necessarily, result in an extension of a subsequent compliance date.

110.    As part of the resolution of any matter submitted to this Court under Section XVI regarding a claim of Force Majeure, the Parties by agreement, or this Court by order, may in appropriate circumstances extend or modify the schedule for completion of work under this Consent Decree to account for the delay in the work that occurred as a result of any delay agreed to by the Parties or approved by the Court.

## XX.    GENERAL PROVISIONS

111.    **No Admission of Fact or Conclusions of Law.** By entering into this Consent Decree or by agreeing to conduct negotiations related to this Consent Decree, the Parties are not admitting any fact or conclusion of law, and this Consent Decree shall not constitute an admission, statement, or evidence of any fact, wrongdoing, misconduct, or liability on the part of the Defendants, their owners, officers, agents, consultants, or affiliated entities. Defendants specifically deny and dispute that any violations or non-compliance as alleged by Sierra Club has occurred or is occurring, and maintain that they have been and remain in compliance with

57

SMCRA, RCRA, the CWA and other applicable federal, state, and local environmental laws and regulations. Defendants state that they are agreeing to the obligations in this Consent Decree solely to avoid the costs and uncertainties of litigation and to improve the environment. Except where a party may challenge the interpretation or application of any condition or requirement of this Consent Decree, the Parties agree this Consent Decree may not be admitted into or used by the Parties in any legal or administrative proceeding that involve the Facilities or the Parties.

112. **No Third Party Beneficiaries.** This Consent Decree provides no direct benefits or confers any rights to persons or entities not a party to this Consent Decree.

113. **Severability.** If any provision or authority of this Consent Decree is held by a court of competent jurisdiction to be invalid or unenforceable, and if that provision or authority is severable from the remainder of this Consent Decree without frustrating the essential purpose of this Consent Decree, the remainder of this Consent Decree shall remain in force and effect. For the avoidance of doubt, any finding that the provisions in Section XI are invalid or unenforceable shall be deemed to frustrate the essential purpose of this Consent Decree.

114. **Scope of Judicial and Administrative Review.** Nothing in the terms of this Consent Decree shall be construed to confer upon this Court jurisdiction to review any decision, either procedural or substantive, to be made by any regulatory agency under the terms of this Consent Decree. Nothing in this Consent Decree alters or affects the standards for judicial review of final agency action. Nothing in the terms of this Consent Decree shall be construed to confer upon any regulatory agency jurisdiction to review any decision, either procedural or substantive, covered under the terms of this Consent Decree. Nothing in this Consent Decree alters or affects the standards or record for administrative review of applicable agency action.

58

115.   **Headings.** Any section or paragraph heading in this Consent Decree is provided solely as a matter of convenience to the Parties and shall not be construed to alter the meaning of any provision herein.

## XXI.  INTEGRATION

116.   This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement reflected in this Consent Decree, and supersedes all prior agreements and understandings among the Parties related to the subject matter in this Consent Decree.

## XXII.  SIGNATORIES AND SERVICE

117.   Each of the Parties consents to entry of this Consent Decree without trial of any issue. Each undersigned representative of the Parties certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind to this document the Party he or she represents.

118.   This Consent Decree may be signed in counterparts, and such counterpart signature page shall be given full force and effect.

119.   Each Party hereby agrees to accept service of process in accordance with the notice provisions set forth in Section XVIII with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rule 4 of the Federal Rules of Civil Procedure and Rule 4 of the Local Civil Rules of the United States District Court for the District of New Mexico, including, but not limited to, service of a summons.

59

## XXIII. DISMISSAL OF BHP BILLITON, LTD. AND PNM RESOURCES, INC.

120.    It is ordered that the claims set forth in Plaintiff's Amended Complaint dated July 6, 2010, and all claims that were or that could have been brought relating to matters alleged in the Lawsuit, are hereby dismissed with prejudice to refiling as to Defendants BHP Billiton, Ltd. and PNM Resources, Inc.

## XXIV. EFFECTIVE DATE

121.    The effective date of this Consent Decree shall be the date upon which the Clerk enters in the civil docket a copy of this Consent Decree signed by the Court.

## XXV.   FINAL JUDGMENT

122.    Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to Plaintiff and Defendants. The Court finds that there is no just reason for delay, and therefore enters this judgment as a final judgment under Federal Rules of Civil Procedure 54 and 58.

[This part intentionally left blank]

**FOR PLAINTIFF SIERRA CLUB:**

Dated: March 28, 2012

PETER MORGAN
Associate Attorney
Sierra Club

**FOR DEFENDANTS PUBLIC SERVICE**
**COMPANY OF NEW MEXICO and PNM**
**RESOURCES, INC.:**

Dated: March 28, 2012

PATRICK J. THEMIG
Vice President of Generation,
Public Service Company of New Mexico

**FOR DEFENDANTS SAN JUAN COAL**
**COMPANY and BHP BILLITON, LTD.:**

Dated: March 28, 2012

JAC FOURIE
President and Chief Operating Officer,
BHP Billiton New Mexico Coal, Inc.

Dated: April 12, 2012

**UNITED STATES DISTRICT**
**COURT JUDGE**

61

**FOR PLAINTIFF SIERRA CLUB:**

_____          Dated: March 28, 2012
PETER MORGAN
Associate Attorney
Sierra Club

**FOR DEFENDANTS PUBLIC SERVICE
COMPANY OF NEW MEXICO and PNM
RESOURCES, INC.:**

_____          Dated: March 28, 2012
PATRICK J. THEMIG
Vice President of Generation,
Public Service Company of New Mexico

**FOR DEFENDANTS SAN JUAN COAL
COMPANY and BHP BILLITON, LTD.:**

_____          Dated: March 28, 2012
JAC FOURIE
President and Chief Operating Officer,
BHP Billiton New Mexico Coal, Inc.

_____     Dated:_____
**UNITED STATES DISTRICT
COURT JUDGE**

61

**FOR PLAINTIFF SIERRA CLUB:**

_____                    Dated: March 28, 2012

PETER MORGAN
Associate Attorney
Sierra Club

**FOR DEFENDANTS PUBLIC SERVICE
COMPANY OF NEW MEXICO and PNM
RESOURCES, INC.:**

_____                    Dated: March 28, 2012

PATRICK J. THEMIG
Vice President of Generation,
Public Service Company of New Mexico

**FOR DEFENDANTS SAN JUAN COAL
COMPANY and BHP BILLITON, LTD.:**

_____                    Dated: March 28, 2012

JAC FOURIE
President and Chief Operating Officer,
BHP Billiton New Mexico Coal, Inc.

_____    Dated:_____

**UNITED STATES DISTRICT
COURT JUDGE**

61